# In the United States Court of Federal Claims

Nos. 25-1659C, 25-1751C
Filed: May 14, 2026
Reissued: June 1, 2026[†]

---

**STEVENS AEROSPACE AND DEFENSE SYSTEMS, LLC,**

**and**

**IACCESS TECHNOLOGIES, INC.,**

*Plaintiffs,*

**v.**

**THE UNITED STATES,**

*Defendant,*

**and**

**BORSIGHT INC.,**

*Intervenor-Defendant.*

---

*Stephanie M. Harden*, with *Robyn Burrows*, *Michael Slattery*, and *Samarth Barot*, Blank Rome LLP, Washington, D.C., for Plaintiff Stevens Aerospace and Defense Systems, LLC.

*Paul F. Khoury*, with *George Petel*, and *Vaibhavi Patria*, Of Counsel, Wiley Rein LLP, Washington, D.C., for Plaintiff iAccess Technologies, Inc.

*Antonia R. Soares*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, with *Douglas K. Mickle*, Acting Deputy Director, *Patricia M. McCarthy*, Director, and *Brett A. Schumate*, Assistant Attorney General, U.S. Department of Justice, Washington, D.C., with *Major Princess Gaye* and *Gareth C. Hyndman, II*, U.S. Air Force, Of Counsel, for Defendant.

*Evan R. Sherwood*, with *Steven M. Masiello* and *Joshua B. Fix*, Dentons US LLP, Washington, D.C., for Intervenor-Defendant.

---

[†] This Opinion was originally issued under seal, (ECF No. 78). The Court provided parties with the opportunity to submit proposed redactions. The Court accepts all proposed redactions. (*See* Joint Status Report, ECF No. 80). The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

**MEMORANDUM OPINION AND ORDER**

**TAPP, Judge.**

In bid protests, the Court monitors the boundaries of agency discretion. It cannot redraw them. Consolidated Plaintiffs, Stevens Aerospace and Defense Systems, LLC ("Stevens"), and iAccess Technologies, Inc. ("iAccess"), urge otherwise. (*See* Order Granting Mot. to Consolidate, ECF No. 37 in Case No. 25-1751). Plaintiffs challenge the Air Force's re-award of a contract to Intervenor-Defendant, Borsight, Inc. ("Borsight") to update training aircraft and simulators.[1] (Am. Compl. at ¶¶ 1, 9, ECF No. 49 in Case No. 25-1659 ("Stevens's Am. Compl."); Compl. at ¶¶ 1–2, ECF No. 1 in Case No. 25-1751 ("iAccess's Compl.")). Plaintiffs bring related claims, most turning on discretionary judgments beyond the Court's purview. Therefore, Stevens's and iAccess's Motions for Judgment on the Administrative Record ("MJARs"), are **DENIED.** (Stevens's MJAR, ECF No. 51; iAccess's MJAR, ECF No. 52). The United States' and Borsight's Cross-Motions for Judgment on the Administrative Record ("Cross-MJARs"), are **GRANTED**. (Borsight's Cross-MJAR, ECF No. 63; Def.'s Cross-MJAR, ECF No. 64). The United States' Motion to Amend/Correct the Administrative Record, (ECF No. 41), is **DENIED**. Stevens's Motion to Supplement the Administrative Record, (ECF No. 50), is **DENIED as MOOT**.

## I.    Background

The United States Department of the Air Force ("Air Force" or "Agency") solicited bids for updates to the avionics of approximately 442 T-6A trainer aircraft and ground based training simulators. (Administrative Record ("AR") 5182, ECF No. 28). The Solicitation established a best-value trade-off source selection process structured around four primary factors: (1) Technical; (2) Technical Risk; (3) Past Performance; and (4) Price. (AR 5185). Only those proposals meeting the threshold requirements of Factor 1 (Technical) advanced to the best-value analysis. (*Id.*). Stevens, iAccess, and Borsight were the most highly rated offerors included in the competitive range for this procurement. (AR 29601, ECF No. 34). The Source Selection Authority ("SSA") summarized the ratings for each as follows:

---

[1] This is Stevens's second challenge to the Air Force's award to Borsight—the first was voluntarily dismissed following corrective action. *Stevens Aerospace and Defense Systems, LLC v. United States*, Case No. 1:25-cv-01339-DAT, __ Fed. Cl. __ (2025).

| Offeror | BOR | iAT | SADS |
|---|---|---|---|
| Factor 1 Technical, SF 1 | Acceptable | Acceptable | Acceptable |
| Factor 1 Technical, SF 2 | Outstanding | Outstanding | Outstanding |
| Factor 1 Technical, SF 3 | Acceptable | Acceptable | Acceptable |
| Factor 1 Technical, SF 4 | Acceptable | Acceptable | Acceptable |
| Factor 1 Technical, SF 5 | Acceptable | Acceptable | Acceptable |
| Factor 2 Technical Risk | Low | Low | Low |
| Factor 3 Past Performance | Satisfactory | Limited | Satisfactory |
| Factor 4 Price | $767,447,755 | $713,347,473 | $764,319,446 |

(AR 52613, ECF No. 38). Ultimately, the SSA determined that Borsight "offer[ed] the best value to include a superior technical proposal with greater benefits and advantages to the Government, low risk, and satisfactory past performance for a slightly higher price[,]" and the Air Force awarded the contract accordingly. (AR 52647). iAccess challenged this award at the Government Accountability Office, (*see* iAccess's Compl. at ¶ 48), and Stevens filed in this Court, (*see* Stevens's Am. Compl. at ¶ 28 (citing *Stevens Aerospace and Defense Systems, LLC v. United States*, Case No. 1:25-cv-01339-DAT, __ Fed. Cl. __ (2025)). In response, the Air Force elected to take corrective action. (iAccess's Compl. at ¶ 55 (citing Compl. Ex. 9, Notice of Corrective Action), ECF No. 1-10 in Case No. 25-1751). The Air Force awarded Borsight the contract once again, and both Plaintiffs renewed their protests in this Court. (Stevens's Am. Compl. at ¶¶ 35–38; *see* iAccess's Compl. at ¶ 1).

## II.    Analysis

iAccess brings four counts against the United States. (iAccess's Compl. ¶¶ 68–143). Stevens brings eighteen. (Stevens's Am. Compl. ¶¶ 39–267). Broadly, Plaintiffs' arguments fall into three categories: (1) technical evaluation and compliance with the Solicitation; (2) communication between the Agency and the offerors; and (3) the Agency's analytical methodology. Across all three, Plaintiffs ask the Court to do something it has no power to do— divine the inner reasoning of the contracting officer and substitute its own.

### A.   Jurisdiction and Standard of Review

When the Court hears a bid protest, it "appl[ies] the appropriate [Administrative Procedure Act] standard of review" in accordance with 5 U.S.C. § 706. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the Administrative Procedure Act ("APA"), "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Judicial review of agency action under the APA is a highly deferential inquiry in which the court asks whether the agency's decision lacked a rational basis, was unsupported by the administrative record, was arbitrary and capricious, or violated a statute or regulation, and the protester must also show prejudice resulting from any such error. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009); *Glenn Def. Marine*, 720 F.3d at 907; *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). "Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether

3

there has been a clear error of judgment.'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

Critically, the Court is expected to apply a "presumption of regularity" and avoid substituting its own judgment for that of the agency. *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *Bowman Transp.*, 419 U.S. at 285. Additionally, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971) (citation modified)). "For that reason, procurement decisions 'invoke[] highly deferential rational basis review.'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *CHE Consulting*, 552 F.3d at 1058) (citation modified)). But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Even so, "a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where . . . the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Here, all parties move for judgment on the Administrative Record. *See* RCFC 52.1. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011). Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

### B. Technical Compliance and Evaluation

Both Plaintiffs argue that Borsight was noncompliant with the Solicitation—failures that should have technically excluded Borsight's proposal from consideration. Specifically, Stevens argues that Borsight was missing a software agreement for a subcontractor, and that Borsight inconsistently committed to data rights. (Stevens's Am. Compl. at ¶¶ 218–27). Stevens also alleges that Borsight's display system failed to comply with Solicitation requirements. (*Id.* at ¶¶ 243–49). Both Plaintiffs argue that the record does not support Borsight's "reliability" figures, (*id.* at ¶¶ 174–92; *see* iAccess's Compl. at ¶¶ 120–22), and that the Air Force improperly assigned strengths to Borsight's proposal, (Stevens's Am. Compl. ¶¶ 108–21, 122–129, 130–46; iAccess's Compl. at ¶¶ 107–22). Finally, iAccess argues that the Air Force overlooked discrepancies in Borsight's Line Replaceable Unit ("LRU") components and Mean Time Between Failure ("MTBF") calculations, and that the procurement officials evaluated Borsight's and iAccess's LRU components disparately. (iAccess's MJAR at 24–36).

Broadly, Plaintiffs ask to substitute the Court's judgment for the technical evaluations completed by procurement officials. It cannot. *See Info. Sciences Corp. v. United States*, 73 Fed. Cl. 70, 104 (2006); *see also Mortgage Contracting Servs. LLC v. United States*, 153 Fed. Cl. 89,

126 (2021) ("The court must especially defer to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'") (quoting *J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 510 (2012)). Alternatively, to the extent that Plaintiffs argue that the Air Force has not substantiated its findings, the Court finds that it has.

First, Stevens argues that Borsight did not provide a requisite software agreement for its subcontractor, ███████. (Stevens's MJAR at 2, 10–12). This, according to Stevens, was a violation of the Software Licensing Requirement in Section H003 of the Request for Proposals ("RFP") and should have rendered Borsight's proposal deficient. (*Id.*). Section H003 of the RFP provides that: "License agreements shall be provided to the Government Contracting Officer concurrent with proposal submission to ensure compliance with the terms and conditions shown below . . . to the extent known at the time an offer is submitted to the Government." (AR 5259, ECF No. 29). Stevens's reading of the section is too narrow. The critical language in Section H003 is "to the extent known at the time an offer is submitted" because this language means software agreements can be finalized post-award. (*See* Def.'s Cross-MJAR at 9). While Clause H003's use of the term "shall" does establish that providing license agreements is a requirement, "to the extent known" plainly indicates flexibility. Each word of the clause has meaning. *See LS3, LLC v. United States*, 168 Fed. Cl. 722, 727 (2023) ("Take the words for what they are.") (quoting T. Swift, *Illicit Affairs* (Folklore), (Republic, 2020)).

In the same breath, Stevens also argues that Borsight's proposal to give the Air Force unrestricted rights to ████████ commercial software is "unusual." (Stevens's Resp. at 6, ECF No. 65). While the Air Force did specifically note the unrestricted rights, (AR 31558), there is no discrepancy between what Borsight promised and what it delivered. (*See* Def.'s Cross-MJAR at 9–10). The sufficiency of Borsight's promised data rights—and the nuances of those rights themselves—is a determination far better suited to the Air Force than a court. *See Mortgage Contracting Servs.*, 153 Fed. Cl. at 126; *J.C.N. Constr.*, 107 Fed. Cl. at 510. If anything, the fact that the Air Force specifically noted the unrestricted rights exemplifies the detailed nature of its inquiry into Borsight's proposal. There is nothing in the record to indicate that this decision was arbitrary or capricious. A contracting officer's decision is not arbitrary merely because a court or a disappointed bidder might have reached a different conclusion. *See Honeywell*, 870 F.2d at 648.

Second, Stevens argues that Borsight's display system is not compliant with the terms of the Solicitation. (Stevens's MJAR at 2–3, 12–13, 19–20, 25). According to Stevens, Borsight's two primary displays ("IDUs") do not provide the required eighty square inches of alternate display area. (*Id.* at 2–3). Stevens argues that the Air Force therefore improperly determined that Borsight met all threshold requirements under Factor 1, Subfactor 1 (Threshold Compliance) and the Section L EN Tables requiring that "displays shall be visible to the flight crew throughout the entire range of operational lighting conditions, from direct sunlight to darkness." (*Id.* at 12–13 (citing AR 19088, ECF No. 32)). Stevens maintains that Borsight did not make any representations concerning its Universal Management Unit's ("UMU") ability to meet this threshold display requirement. (*Id.* at 13). In turn, the United States argues that the Air Force's evaluation of Factor 1, Subfactor 1 was based on each offeror's technical approach for meeting the requirements in Sections L and M, which stated: "for requirements marked as 'Y' in the Full Compliance column, no further explanation or rationale is required." (Def.'s Cross-MJAR at 11

(citing AR 18063–64, 18105, 18107)). Both Borsight and Stevens were marked "Y" in the Full Compliance column, so they met the Factor 1, Subfactor 1 requirements. (AR 51726, 52121). In its Final Proposed Revision ("FPR"), Borsight also discussed the properties of the "IDU-680 flight display supplemented with the Borsight UMU keyboard unit" in detail, stated that the UMU met 100% of the testing requirement, and relayed the fact that the IDU-6802 exceeded the testing requirements by 40%. (AR 24916 (Section L EN Tables, SF1 Threshold Compliance, Cell B109), 41196, ECF No. 36).

The United States argues that Stevens is "creating a requirement that simply doesn't exist." (Tr., 67:10–11, ECF No. 73). The Court agrees once again. Even if it could delve into the mind of the Air Force testing and procurement officials, the plain language of the Solicitation indicates that "no further explanation or rationale is required" for fully compliant proposals. (AR 18107).

Stevens hurls a number of additional accusations at the Air Force's technical evaluations of Borsight. (Steven's MJAR at 13–21 (arguments related to: Subfactor 2(a)(ii) of Factors 1 and 2 (Solar Hardiness); Subfactor 2(b)(iii) of Factor 1 (Display Configurability); and Subfactor 2(b)(iv) of Factors 1 and 2 (Sustainability)). The Court has reviewed the arguments and the Administrative Record and finds that these determinations were squarely within the discretion of the contracting officer. It is not the Court's place to second-guess the Air Force's findings. *Info. Sciences Corp.*, 73 Fed. Cl. at 104; *see Mortgage Contracting Servs*., 153 Fed. Cl. at 126.

Both Stevens and iAccess argue that the record does not support Borsight's "reliability" figures—referring to the MTBF figures reported by Borsight. (Stevens's MJAR at 3, 21–26; iAccess's MJAR at 24–36). Specifically, Stevens contends that "Borsight's calculated system-level total MTBF of ▮▮▮▮ hours [in its FPR] is patently incorrect," because Borsight updated some of its MTBF figures during discussions with the Air Force. (Stevens's MJAR at 22, 23 (citation modified)). In other words, there was a back-and-forth between the Air Force and Borsight regarding the MTBF calculations for the inhabited and uninhabited portions of the aircraft that resulted in Borsight's MTBF rising by 16,000 hours. (Tr., iAccess, 31:21–32:10, 33:2–7). The Court does not get to opine on whether the Air Force properly evaluated the safety of these aircraft. (Tr., 33:18–19); *see COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1384 (Fed. Cir. 2012) (noting that technical-scoring disputes concern procurement minutiae and discretionary determinations insulated from judicial second-guessing). However, as iAccess points out—the Air Force awarded Borsight an additional significant strength based on these allegedly erroneous numbers. (Tr., 35:19–22). In response, the United States argues that the Air Force is entitled to rely on Borsight's MTBF figures absent "significant countervailing evidence reasonably known to the agency evaluators that should create doubt" about the accuracy of those values. (Def.'s Cross-MJAR at 17 (quoting *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 (Fed. Cir. 2011))). Similarly, Borsight attacks Plaintiffs' arguments as "rhetoric" and notes that "[t]he protestors' arguments underscore why it is not appropriate to re-evaluate the technical minutia of the procurement process through litigation." (Borsight's Cross-MJAR at 17–18). In an ideal world, Borsight and the Air Force would have included more explanation as to how and why Borsight's MTBF numbers increased so dramatically during discussions, but in the arcane world of government contracting—this does not rise to the level of abuse of discretion or arbitrary or capricious action on the part of the Air Force. *See Bowman*

*Transp.*, 419 U.S. at 286 (an agency decision of less-than-ideal clarity should be upheld if the agency's path is reasonably discernible). As the Court noted during the oral argument, "[it is] not a physicist[,]" (Tr., 33:19), and lacks sufficient evidence to overturn the Air Force's decision making with regards to Borsight's MTBF calculations.

iAccess also argues that the Air Force disregarded risks by overlooking discrepancies in Borsight's LRU components and improperly allowed Borsight to use only three LRU components for its CFIT-P calculation, while requiring iAccess to revise its model to include five LRU components. (iAccess's MJAR at 25–27 (citing Subfactor 2(a)(i)), 31–34 (citing Subfactor 2(b)(i))). However, iAccess fails to account for the fact that Borsight resolved its issues related to subfactors 2(a)(i) and 2(b)(i). (*See* Def.'s Cross-MJAR at 42–43 (citing AR 30294–96 for the proposition that although the Air Force initially assigned Borsight a weakness for using one part number in its proposal (███████) and a different part number in its L EN Table (P/N ██████), Borsight resolved the issue during discussions)). Similarly, for Subfactor 2(b)(i), the Air Force identified a weakness in Borsight's approach because its "proposal appear[ed] to not account for all the LRUs required for the TAWS/CFIT-P function[.]" (AR 30297). However, Borsight recalculated the MTBF and accounted for the missing LRUs—which met the objective requirement. (Def.'s Cross-MJAR at 42–44 (citing AR 30297–98); *see also* AR 51734 (the Air Force finding that Borsight exceeded the MTBF requirements for Subfactor 2(b)(i))). Nevertheless, iAccess argues that Borsight failed to account for all LRUs—the weakness was for Borsight's CFIT-P system which was missing several components "to include ***but not limited to*** the Global Positioning System (GPS)/Satellite Base Augmentation System (SBAS) Receiver and HUB45 LRU" yet Borsight provided MTBFs for only two of the "missing several components." (iAccess's Resp. at 10, ECF No. 66 (citing AR 45866, AR 45871–72)). According to iAccess, the Air Force's reasoning is therefore circular—the flaws in Borsight's revised calculations were revealed *after* the weakness was assessed. (*Id.*).

The Court is not persuaded. The United States correctly observes that iAccess fails to recognize that it agreed that its own proposal did not calculate the MTBF for the CFIT-P function correctly, and that it was unable to resolve this issue. (Def.'s Cross-MJAR at 44; *see* AR 31829, 32938–39). The Air Force accepted Borsight's revised assertion that its "CFIT-P system had three subassemblies" and its "proposed system configuration for CFIT-P has a calculated MTBF of 11,260 hours." (AR 41520). It is not the Court's role to second-guess the Air Force's analysis. *See Off. Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020) (rejecting protestor argument that would "give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings."). The Air Force did not ignore several higher LRU component MTBFs from iAccess's proposal, or fail to give iAccess credit for identifying each component's MTBFs. (iAccess's MJAR at 35–36 (citing Subfactor 2(a)(iii))). The Air Force found that "[Borsight]'s approach provided higher component MTBFs as compared to iAccess's approach" even though iAccess's Keyboard's MTBF was 148,302 and Borsight's was 23,177. (AR 25506, 52363)). According to the United States, this was because the iAccess Keyboard MTBF applies only to a keyboard, whereas the MTBF for Borsight reflects the combination of the two components that make up the UMU—a UMU Display Control Module and a UMU Remote Keyboard Module. (Def.'s Cross-MJAR at 46 (citing AR 41203)). This distinction meant the Air Force was evaluating different assemblies rather than comparable standalone components. Therefore, the Air Force's conclusion that iAccess's approach did not provide higher component MTBFs was reasonable.

Finally, iAccess challenges the Air Force's interpretation of language in its proposal regarding testing of its temperature exceedance. (iAccess's MJAR at 35). iAccess's proposal states: "[b]ased on analysis and the results from the previous testing, the iAccess Team has assured the equipment selected will EXCEED the threshold requirement of SRD 3.5.6.3.2 when tested for the ARP." (AR 25507–08). iAccess's proposal also contained a table noting that it "will retest for exceedance." (AR 25507). The Air Force took this to mean that iAccess had not yet tested the equipment. (Def.'s Cross-MJAR at 45–46). iAccess argues that this was a misreading of the plain language of its proposal—the Air Force ignored the phrase "[b]ased on analysis and the results from the *previous testing*[,]" (AR 25507), and should have given iAccess credit, (Tr., 38:3–39:2). However, Court finds it reasonable that the Air Force relied on the language "*will* exceed . . . *when* tested for the ARP." (AR 25507–08 (emphasis added)). iAccess uses the future tense to describe testing, creating a logical assumption that testing had not yet occurred. Tellingly, iAccess uses the past tense to describe testing for fuselage and cockpit zone equipment in the same section of its proposal. (*Compare* AR 25507 ("the iAccess Team's offer EXCEEDS the threshold Temperature Qualification requirements of SRD 3.5.6.3.1 for Fuselage Zone installed equipment . . .") *and* AR 22508 ("the iAccess Team's offer EXCEEDS the threshold Temperature Qualification requirements of SRD 3.5.6.1 for Cockpit Zone installed equipment . . .") *with* AR 25507–08 ("the iAccess Team has assured the equipment selected *will* EXCEED the threshold requirement of SRD 3.5.6.3.2 *when* tested for the ARP.") (emphasis added)). No contracting officer could reasonably be expected to read past the plain language of iAccess's proposal, especially given the surrounding context. *See Warrior Focused Sols., LLC v. United States,* 175 Fed. Cl. 416, 429 (2025) ("Contracting officers and bidders share an equal obligation to ensure clarity; agencies cannot be expected to read between the lines and make sense of proposal terms."). iAccess's argument fails.

Neither Plaintiff has demonstrated that the Air Force acted arbitrarily or capriciously when evaluating the technical components of the offerors' proposals. *See Weeks Marine,* 575 F.3d at 1358. Nor have they shown any violation of statute. *Id.* Most of the protestors' arguments here run headlong into agency discretion. The contracting officer was squarely within his or her authority to evaluate the software rights, display systems, reliability figures, and the capacity of Borsight to deliver on its promises. The Air Force reasonably interpreted both proposals with regard to the testing and performance of the equipment at issue—and the parties have provided no basis for the Court to second-guess the Air Force's decision.

### C. Communications Between Offerors and the Air Force

Stevens argues that the Air Force conducted unequal discussions with Borsight regarding a missing software license in its FPR.[2] (Stevens's MJAR at 7–10). According to Stevens, the Air Force notified Borsight multiple times that it was missing a license agreement for Red Hat Linux ("Red Hat") software. (*Id.* at 8–9; Tr., 13:17–20). Stevens argues that these notifications amounted to an improper discussion, (Stevens's MJAR at 9), and the missing license should have immediately disqualified Borsight from consideration. (Stevens's Resp. at 4–5). There is no dispute that Borsight was required to include the Red Hat license in its contract volume, and it

---

[2] Notably, iAccess does not raise this issue. (*See* iAccess's MJAR, ECF No. 52).

did not. (*See* Tr., 51:22–23). On March 19, 2025, the Air Force emailed Borsight to notify it that its FPR failed to include the Red Hat license. (AR 53277). That same day, the Air Force extended the FPR deadline for all offerors in the competitive range to March 21, 2025. (AR 52389). This was due to technical computer issues due to "extremely high winds" on the original FPR due date. (*Id.*; Tr., 68:13–69:14). Stevens insinuates that this extension was a surreptitious decision by the Air Force in order to allow Borsight extra time to resubmit its FPR with the missing license. (*See* Stevens's MJAR at 8–9).

There is no merit to this argument. High winds affected the Air Force's computer system and so it reasonably extended the deadline for *all* offerors in the competitive range, including Stevens. (AR 52389; *see also* Tr., 68:7–24 (elaborating on the impacts of wind on the Air Force's computer systems)). While the Red Hat license was "mistakenly omitted from [Borsight's] FPR[,]" (AR 42304, ECF No. 36), the Air Force already had the Red Hat license in its possession—it was just not attached to the Contract Volume portion of Borsight's proposal. (AR 30753–54; Tr., 56:7–57:19). Borsight responded by attaching the license, still before the deadline for final proposed submissions. (*See* AR 42303). Given that the Air Force already had possession of the software license, and references to the software license existed throughout Borsight's proposal, (AR 41891), it would be too exacting for the Court to find that this omission invalidated Borsight's proposal.[3]

Because Borsight's omission did not withhold any information essential to the Agency's evaluation, it qualified as an obvious minor clerical mistake of the sort the FAR allows contracting officers to resolve. *See* FAR § 15.306(a) (authorizing contracting officers to seek clarifications to correct clerical or similarly minor errors). The Court concludes that the email notifying Borsight of the missing software license does not rise to the level of a discussion. *Dell Fed. Systems, L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018). FAR § 15.306(a)(1) defines a clarification as a "limited exchange . . . that may occur when award without discussions is contemplated." Importantly, clarifications, as opposed to discussions, do not allow for proposal revisions. *Aspire Therapy Servs. & Consultants, Inc. v. United States*, 166 Fed. Cl. 366, 377 (2023). The March 19, 2025 email to Borsight stated, "your company has the opportunity to review your proposal and resubmit your FPR if you choose." (AR 42304). Stevens argues that this language "constituted a discussion because it was intended to allow Borsight to revise its proposal." (Stevens's Resp. at 3). What the Air Force "intended to allow" is beyond the scope of this Court's jurisdiction—it does not have the power to divine meaning beyond the words on the

---

[3] Stevens argues that without the license, the Air Force would not have "reasonable certainty as to the contract's material terms." (Stevens's Resp. at 5 (citing *Bionetics Corp. v. United States*, 159 Fed. Cl. 834, 842 (2022); *APT Research, Inc. v. United States*, 154 Fed. Cl. 526, 537 (2021) (for the proposition that "missing copy of signed agreement was not a minor clerical error that could be corrected through discussions[.]"), ECF No. 65). However, the issue in *APT Research* was over a required employee agreement that was missing entirely—not a copy of an agreement as Stevens suggests. 154 Fed. Cl. at 537. The Plaintiff in *APT Research* argued not only that the missing employee agreement should not have invalidated their protest, but that the agreement was not actually required at all. *Id.* The Court found for the United States. *Id.* Here, Borsight had previously included the software agreement, and referred to it throughout its proposal.

page. The words "review" and "resubmit" do not mean the same thing as "revise" and, read in context, the email conveyed nothing more than a notice that the license was missing. Either way, Borsight made no substantive revisions to its proposal beyond attaching the missing license. (AR 42303; *See* Tr., 75:13–76:4).

Stevens asks the Court to draw a parallel between the Air Force's email to Borsight about the Red Hat license, and that the Air Force was unable to obtain past performance references for a $666 million contract performed by one of Stevens's subcontractors, CAE US, Inc. ("CAE"). (Stevens's MJAR at 29–31; *see* Stevens's Am. Compl. at ¶¶ 49–59). This comparison is "apples to oranges[.]" (Tr., 62:23–63:2). In discussions, the Air Force notified Stevens that it was unable to contact CAE's reference. (AR 34347 (the Air Force informed Stevens that "the POC and Key Individuals provided lacked past performance quality information, resulting in 'Unknown' quality for each contract noted."), ECF No. 35). Stevens responded by providing updated references and contact information. (AR 34348–49). However, one of the references provided "ha[d] no knowledge of performance on that contract[,]" and the other reference did not respond. (AR 48082–84, ECF No. 37). Stevens also complains that the Air Force was not able to locate Contractor Performance Assessment Reporting System reports ("CPARS") for the CAE contract, in violation of the "too close at hand" doctrine. (Stevens's MJAR at 31). This refers to the premise that "[i]t is well-established that 'some information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain, and consider, the information.'" *Insight Public Sector, Inc. v. United States*, 157 Fed. Cl. 398, 410 (2021) (quoting *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 781 (2011)). There is a limit, however: "[c]ourts typically limit the universe of information that it considers 'too close at hand' to documents in the possession of the contracting agency or information that is personally known to the contract evaluator." *Id*.

Whether an apple or an orange, Stevens does not get unlimited bites. The Air Force notified Stevens that it could not track down CAE's past performance references, and ultimately Stevens could not provide the information requested. (AR 34347). The Air Force could not have done anything differently given the circumstances. This situation is nothing like the Air Force's email to Borsight—an obvious issue that Borsight promptly rectified prior to the RFP deadline. Nor did the Air Force violate the "too close at hand" doctrine—the Air Force did not have the Past Performance Questionnaires ("PPQ") and CPARs for CAE in its possession. (AR 52213); *see Insight Public Sector*, 157 Fed. Cl. at 410. The Air Force was justified in assigning Stevens an "Unknown" when the information was indeed unknown. *AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 360 (2023) ("[C]ourts have frequently recognized that a procuring agency is not expected to hunt for potentially responsive information that is not included or not adequately presented in the relevant section of an offeror's proposal."). In sum, the Court finds that the communications between Borsight and the Air Force did not rise to the level of discussions. Nor is there a parallel between the Borsight email and the Air Force's inability to obtain past performance references for the CAE contract. Stevens's arguments are unavailing.

### D.  The Agency's Analytical Methodology

Plaintiffs' remaining complaints are directed at the Air Force's analytical methodology—the way the Agency aggregated its evaluations and determined whether to consider certain components of past performance, assigned ratings, and conducted its best-value and

responsibility determinations. (Stevens's Am. Compl. at ¶¶ 70–97, 178–188, 228–242; iAccess's Compl. at ¶¶ 123–143). None of Plaintiffs' arguments bear fruit.

First, Stevens argues that the Air Force's responsibility determination for Borsight was unreasonable because Borsight holds a "red" Supplier Risk Score in the Supplier Performance Risk System ("SPRS"). (Stevens's MJAR at 26–28). This, according to Stevens, should have triggered the FAR § 9.104-3(b) presumption of non-responsibility because a "red" SPRS score is the lowest possible rating. (*Id.* at 26). FAR § 9.104-3(b) states in part: "A prospective contractor that is or recently has been seriously deficient in contract performance shall be presumed to be nonresponsible, unless the contracting officer determines that the circumstances were properly beyond the contractor's control, or that the contractor has taken appropriate corrective action." Borsight's poor rating stems largely from multiple Corrective Action Requests ("CARs") issued under a contract with the North Atlantic Treaty Organization ("NATO"). (AR 53875). The United States argues that there is no evidence demonstrating that Borsight has been "seriously deficient in contract performance[,]" and that there are "many other sources of information that the contracting officer can consult in determining whether an offeror has a satisfactory past performance record." (Def.'s Cross-MJAR at 18–20). Section 209.105-1 of the Defense Federal Acquisition Regulation Supplement ("DFARS") states in part that "[c]ontracting officers shall consider the supplier risk assessment available in the [SPRS] . . . when determining responsibility." DFARS § 209.105-1(2)(iii) (citing DFARS § 204.7603). However, the section begins with: "[a] satisfactory performance record is a factor in determining contractor responsibility[,]" and that CPARS are also "[o]ne source of information relating to contractor performance . . . ." *See* DFARS § 209.105-1(2)(i). The United States argues that this language does not automatically exclude offerors with red SPRS scores, (*see* Def.'s Cross-MJAR at 18-21), and this Court agrees.

The plain language of DFARS § 209.105-1 makes it clear that the SPRS score is one of *many* considerations the Agency must evaluate. And here, the Air Force did so. The record reflects that "[t]he Government interviewed the program at NATO regarding the contractor's performance." (Tr., 22:18–21; *see* AR 26996, 53872, ECF No. 59). This refers to a July 2023 email exchange with NATO about the contract at issue, which stated that Borsight "was/is completing work in accordance with contract requirements." (AR 26996). Stevens takes issue with the timing of this exchange, because some of the CARs were issued afterward. (Stevens's MJAR at 27 (citing AR 53875)). However, a red SPRS score does not create a per se presumption of non-responsibility, as Stevens suggests. "Contracting officers are generally given wide discretion in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (citation modified). Even FAR § 9.105-1(c) states that contracting officers may also consider "any other relevant past performance on the offeror[,]" thereby conferring a significant degree of discretion.

Even still, the contracting officer *did* consider Borsight's risk assessment in the Contractor Responsibility Determination and Findings document, and acknowledged that one of the Somewhat Relevant contracts that the Air Force evaluated contained CARs in the SPRS system. (AR 53872). As properly noted by the United States: "the presence of CARs on a contract does not mean that a contractor has been seriously deficient in performance or require the contracting officer to ignore the extensive past performance evaluation completed throughout

the source selection process." (Def.'s Cross-MJAR at 21). In other words, Borsight's CARs are not the silver bullets Stevens wishes to cast them as. While more information about the contracting officer's analysis of Borsight's red risk rating would have been welcome here, the Court must make do. *Thalle Constr. Co. v. United States*, 169 Fed. Cl. 592, 642 (2024) (an agency's decision need not be "a model of clarity."). The contracting officer considered Contract No. 4600004024 when analyzing the full picture of Borsight's past performance. Nothing more is required. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30–31 (1983) (agency action is lawful if it rests "on a consideration of the relevant factors . . . .").

Second, Stevens argues that the Air Force should have assigned it a Significant Strength (rather than a Strength), for RFP § M.2.2.2 Subfactor 2(a)(i), which required the agency to evaluate whether threshold requirements for several environmental qualification categories had been met or exceeded, including temperature qualifications for certain LRUs. (Stevens's MJAR at 28–29; *see* AR 18107–109, 44242 (Tab 122a1, LRU Sheet, Column K)). Specifically, Stevens contends that the Air Force did not give credit for exceedances for the relevant LRU components.[4] (Stevens's MJAR at 28–29). However, these units met but did not exceed the temperature requirements. (*See* AR 52127–28, 52360, 52617, 52364 (explaining that Borsight "provides temperature qualification exceedances for *all* equipment located in the cockpit and temperature variation qualification exceedances for *some* equipment located in the cockpit and fuselage[,]" versus Stevens, which "provides temperature variation qualification exceedances for *most* equipment located in the cockpit and fuselage and temperature qualification exceedance for *one* piece of equipment located in the cockpit.") (emphasis added)). Furthermore, the United States contends that Stevens is double-counting in the LRU sheet that it provided to the Air Force. (Def.'s Cross-MJAR at 16–17). Several part numbers appear to be double-counted or duplicated multiple times. For example, LRU Manufacturing Part Number 011-04187-60 appears twice in Stevens's LRU Sheet. (AR 44242 (Tab 122a1, LRU Sheet, Rows 4 and 5)). Such duplication lies within the evaluative judgments entrusted to an agency, and it underscores that the Air Force reasonably evaluated the data before it. (*See* AR 52127–28, 52360, 52617, 52364). It is not the Court's role to scrutinize the minutiae of the contracting officer's evaluation, nor will it substitute its own judgment for that of the Air Force. Thus, Stevens's argument fails.

Similarly, it is beyond the Court's purview to micromanage judgment calls made by the Air Force. Nonetheless, Stevens argues that the Air Force unreasonably failed to consider past performance information from certain references due to possible source bias, and that the RFP does not support the Air Force's decision to exclude references that were affiliated with teaming partners of other offerors. (Stevens's MJAR at 32–33). For its part, the Air Force rated the quality of three of Stevens's past performance references as "Unknown" due to "possible source bias which was due to the [PPQ] author's association as a teaming partner of other Offerors in this competition." (Def.'s Cross-MJAR at 25 (citing AR 52636–37)). The United States argues that this explanation is sufficient and that the Agency's judgment call is entitled to deference. (*Id.* at 26 (citing *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 567 (2000) ("Agency

---

[4] The relevant LRU components are: GI275, GSU 75B, GEA 71B and GVM53. (Stevens's MJAR at 28–29).

personnel are generally given great discretion in determining what references to review in evaluating past performance.”))). This Court agrees and sees no error in the Air Force's decision to discount those references.

Third, Stevens argues that the Air Force unreasonably determined that Stevens's subcontractor Dayton T. Brown (“DTB”) failed to qualify as a “significant contractor” and, as a result, the Air Force unreasonably determined not to consider its past performance. (Stevens's MJAR at 33–34). A “[s]ignificant subcontractor is defined as a contractor who is proposed to perform over 5% of the total effort, or a contractor who is proposed to perform less than 5% of the total effort, but is determined to be performing a critical function.” (AR 18069, ECF No. 33). The United States argues that DTB only provided 1% of the total effort, *and* it was not a critical function. (Def.'s Cross-MJAR at 27 (citing AR52185–86)). The United States also points out that “[DTB]'s portion of effort related to technical orders was only 1% while Borsight's total portion of effort, including technical orders, was 57%.” (*Id.* (citing AR 51797, 52186)). In response, Stevens claims that the Air Force's conclusion that DTB does not perform a critical function “lacks contemporaneous support and contradicts the RFP and the Air Force's own evaluation.” (Stevens's Resp. at 26). Specifically, Stevens argues that the Past Performance Evaluation Team (“PPET”) failed to “explain[] why technical orders are not a critical function, particularly given the RFP's requirement that offerors describe their approach to identifying, developing, and delivering technical orders to be eligible for award.” (*Id.* at 27). Stevens reads too far into the responsibilities of the PPET and the RFP, conflating thoroughness of review with thoroughness of documentation. The APA demands reasoned decision making, not a granular accounting of every step in the procurement process. *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (agencies must engage in “reasoned decisionmaking.”).

Fourth, Stevens argues that the Air Force unduly credited iAccess in evaluating the past performance of iAccess's subcontractor, Greenville Kearns Aerospace Maintenance, Inc. (“GKAM”), because there is “no support” for the Air Force's determination that “GKAM demonstrated an approximate aircraft modification rate of ▮ per year.” (Stevens's MJAR at 35 (citing AR 47613, 52525, 52630)). The GKAM contract “included ▮ aircraft modifications in approximately 6.5 months which is approximately ▮ (AR 52038). The Air Force arrived at this figure by ▮ by 6.5 to find the monthly rate ▮ and then calculating the annual rate by ▮, which equals ▮ per year. (*See* Def.'s Cross-MJAR at 28; AR 42984). This straightforward calculation reflects a rational method for translating the offeror's proposed rate into an annualized figure. Once again, the Court finds the Air Force's analysis reasonable. Ironically, it appears to actually be Stevens that did not show its work—the United States points out that Stevens did not support its assertion of “555 avionics modifications/upgrades[,]” but that its math was in line with an annual aggregate of 17 modifications. (Def.'s Cross-MJAR at 29 (citing AR 34353–54)).

Fifth, iAccess raises a number of arguments about the Air Force's so-called “aggregation methodology.” Specifically, iAccess claims that the Air Force's “aggregation treated Somewhat Relevant and Relevant contracts the same . . . [which] unfairly penalized offerors who did not know they could tip the evaluation by using a subcontractor with one large, Somewhat Relevant contract.” (*Id.* at 23–24). As a preliminary matter, to the extent that iAccess asks this Court to reevaluate the Air Force's analysis of the relevance of its subcontracts, the Court declines. (*See e.g., id.* at 20 (“[t]he conclusion that Canard's subcontract is Not Relevant both ignored the scope

13

of work performed by Canard under that subcontract and its proposed role is inconsistent with the rating of the prime contract for the same effort.")). This kind of minutiae is outside the Court's reach. iAccess further argues that the Air Force "again used an undisclosed and arbitrary system to aggregate past performance references" related to the magnitude of contract value and aircraft modified. (iAccess's MJAR at 22–24 (citing AR 49174, 51833)). The Solicitation states that: "[r]elevancy in regard to magnitude may be assessed based on, but not limited to, the similarities between a given Past Performance effort and the proposed requirement[,]" and "[c]onsideration may be given to the following elements when determining relevancy with regard to magnitude: Number of aircraft modified per year[, and] Contract value as it relates to the portion of effort proposed to perform[.]" (AR 18114). The Solicitation also states that "[t]he Government may consider past performance in the aggregate in addition to on an individual contract basis." (AR 18113).

The Air Force's methodology for aggregating contract value was not "undisclosed[.]" (*See* iAccess's MJAR at 22). The PPET reviewed 16 contracts for iAccess, with varying degrees of relevancy, and determined that iAccess "performed work on an aggregate concurrent contract value of ▇▇▇ which [was] significantly less than the T-6A ARP requirements and therefore, not relevant magnitude." (AR 51985). For Borsight, the PPET reviewed 14 contracts, also with varying degrees of relevancy, and found that "[f]or magnitude, Borsight demonstrated . . . an aggregate concurrent contract value of $▇M[,]" which was also "significantly less than the T-6A ARP requirements and therefore, not relevant magnitude." (AR 51798). However, the Air Force also found that Borsight's team member BAE "demonstrated . . . a contract value of $▇B" which was "comparable to the T-6A ARP requirement." (*Id.*). iAccess's team member FlightSafety fell short of the magnitude requirement. (AR 51799). All three offerors "miss[ed] full relevancy for Contract Value under magnitude, which the PPET used the concurrent aggregate value to equally compare the contract value of each Offeror." (AR 52378). The PPET's analysis "resulted in a less than relevant rating for both [Borsight] and [Stevens], and a significantly less than rating for [iAccess] in relation to the portion of effort proposed to perform for the T-6 ARP effort." (*Id.*).

The United States directs the Court to the following Solicitation language: "[t]he Government may consider past performance in the aggregate in addition to on an individual contract basis." (Def.'s Cross-MJAR at 37 (citing AR 18112–13)). According to the United States, the RFP did not specify how the Agency was to determine aggregate contract values. (*Id.* at 38 (citing *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 38 (2011), *aff'd*, 484 F. App'x 558 (Fed. Cir. 2012) (when an agency "d[oes] not commit itself to a particular evaluation methodology in the Solicitation, it [i]s entitled to exercise broad discretion with regard to how to conduct its analysis.")). Therefore, according to the United States, "Section M of the [S]olicitation affords the Air Force complete discretion." (Tr., 40:5–6).

The Court does not accept the United States' broad assertion that silence in an RFP grants the Agency unfettered discretion. FAR 15.305(a)(2)(ii) requires that a solicitation "describe the evaluation factors and significant subfactors and their relative importance," which necessarily includes the methodology an agency intends to use when assessing past performance. That said, the Solicitation here did provide the Air Force with some evaluative flexibility by stating that the Government "may consider past performance in the aggregate in addition to on an individual contract basis." (AR 18112–13). And although FAR 15.305(a)(2)(ii) requires the Solicitation to

14

describe the evaluation factors and methodology with sufficient clarity, the RFP's express separation of "Relevant" and "Somewhat Relevant" categories reflects a baseline framework for how past performance would be assessed. Still, no party has identified any portion of the Administrative Record in which the contracting officer explained—or even acknowledged—the method for combining those categories when evaluating aggregate past performance. (Tr., 44:8–12). This is concerning to the Court. [5]

Even so, an agency need not identify evaluation elements "intrinsic to the stated evaluation factors." *Banknote Corp.*, 56 Fed. Cl. at 387. As the Court has explained, "a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain great discretion in determining the scope of a given evaluation factor." *Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 180 (2020) (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010)). In other words, once the solicitation identifies the evaluation factors and subfactors—as FAR 15.305 requires—the agency may reasonably exercise discretion in how it assesses information within those factors, even if its decision does not spell out the precise mechanics of that assessment. Here, the record does not support iAccess's assertion that the Air Force collapsed the "Relevant" and "Somewhat Relevant" categories or otherwise treated them as interchangeable; rather, the PPET documented the value and relevance of each contract before assessing aggregate magnitude. Thus, although the lack of an articulated combining methodology is less than ideal, it does not render the evaluation unlawful where the Solicitation expressly permitted aggregate consideration and the underlying judgments fall within the Agency's discretion. On this record, there is no indication that the Agency's methodology was arbitrary or capricious; to the contrary, the depth and specificity of the Source Selection Decision Document demonstrates a rational and well-supported evaluation.

Sixth, iAccess claims that even though Borsight and iAccess each proposed the same subcontractor and used the same performance reference, FlightSafety's W900KK-17-C-0010 contract, the Air Force inexplicably assigned higher ratings to Borsight under scope and magnitude. (iAccess's MJAR at 13–15). Borsight got a "relevant" rating, but iAccess only got a "somewhat relevant" rating. (*Compare* AR 51846 (Borsight's rating) *with* AR 52041 (iAccess's rating)). Section M.2.4.2.2 of the RFP states that "[i]n determining relevancy for individual contracts, consideration will be given to the effort, or a portion of the effort, being proposed by the Offeror, teaming partner, or subcontractor whose contract is being reviewed and evaluated." (AR 18113). The United States points out that while both offerors did use the same contract, "there were differences in the scope and magnitude elements that the agency assigned to each offeror based on the proposed roles each offeror provided to the agency related to that contract."

---

[5] To the extent that the alternate aggregation strategies outlined within the Solicitation are inconsistent—one ranking past performance by hierarchical category and the other more broadly permitting consideration of past performance in the aggregate—any such tension was apparent on the face of the Solicitation. Under *Blue & Gold Fleet*, a disappointed offeror must challenge a patent ambiguity before the close of bidding or forfeit the argument. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Because iAccess did not raise this issue pre-award, it cannot now rely on that alleged inconsistency to invalidate the Agency's evaluation.

(Def.'s Cross-MJAR at 30). iAccess tries to frame these as post-hoc rationalizations, arguing that the Air Force disregarded FlightSafety's proposed role ███████████████ ██████ (iAccess's Resp. at 5). Because the offerors' proposed responsibilities under the shared contract were materially different, the agency had a reasonable basis for assigning different relevance assessments. (*Compare* AR 51846–47 (Borsight's "very similar" scope and "similar" magnitude) *with* AR 52041 (iAccess's "similar" scope and "not similar" magnitude); *compare* AR 30420 (Borsight's proposed portion of effort for FlightSafety was █%) *with* AR 52629 (iAccess's proposed portion of effort for FlightSafety was █%)). It is not the role of this Court to substitute its judgment for that of an agency, so long as the agency's decision reflects reasoned decision making. Here, the Air Force's discretionary evaluation was reasonable.

Finally, iAccess argues that the AirForce should have undertaken a more "qualitative assessment" of its best value tradeoff determination, and "mechanically awarded" the contract to Borsight based on "rote counting of strengths and significant strengths under Factor 1 and its mechanical reliance on Borsight's Satisfactory Confidence rating under Factor 3." (iAccess's MJAR at 38–39). iAccess also contends that the best value factor "unreasonably discounted the importance of price" and that the Air Force should have provided more information about why it awarded the contract to Borsight—the highest-priced offeror. (*Id.*). Under the Comparative Analysis of Factor 3 (Past Performance), Borsight received a Satisfactory Confidence rating, and iAccess received a Limited Confidence rating. (AR 52625–29). iAccess argues it would have received a higher rating if there had been differentiation between these contracts, pointing to the favorable language it received in the analysis. (Tr., 25:12–26:2, 30:7–18; *compare* AR 52626 ("[Borsight] demonstrated relevant performance in most areas of scope, some areas of magnitude, and most areas of complexity[,]") *with* AR 52630 ("[iAccess] demonstrated relevant performance in all areas of scope, most areas of magnitude, and most areas of complexity.")). Thus, the aggregation, according to iAccess, resulted in a "huge advantage" for Borsight. (Tr., 25:16–19; *see* iAccess's MJAR at 22–24). Section M.2.4.2 of the Solicitation mandates that "[t]he government will use the following degrees of relevancy . . . when assessing recent, relevant contracts[:]"

| Adjectival Rating | Description |
|---|---|
| VERY RELEVANT (VR) | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| RELEVANT (R) | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| SOMEWHAT RELEVANT (SR) | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| NOT RELEVANT (NR) | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

16

(AR 18113–14).[6] None of these arguments survive closer examination.

The Solicitation provides that "best value credit will be applied as strengths/significant strengths to the offerors proposal[,]" and that, "[f]or the best value determination, tradeoff considerations for Subfactor 2 will be based on any Government-assigned strengths/significant strengths in each Offeror's approach, along with the anticipated level of benefit received by the Government during contract performance resulting from the strength(s)/significant strength(s)." (AR 18107–08). The United States argues that the Air Force considered the quantitative total number of strengths and significant strengths from the various Subfactors and the qualitative benefits from each of these Subfactors. (Def.'s Cross-MJAR at 47–49). Furthermore, the Solicitation provides that "technical acceptability in Technical Subfactors 1, 3, 4, and 5 is a prerequisite to the best value analysis with potential trade-off between Factor 1, Subfactor 2 Meeting Objective Requirements and Exceedances of Threshold Requirements contained in SRD, Factor 2 Technical Risk, Factor 3 Past Performance, and Factor 4 Price." (AR 18104–05). In other words, "non-price factors are more important than price individually and, when combined, are significantly more important than price." (Def.'s Cross-MJAR at 48). iAccess misconstrues the language of the Solicitation and the Air Force's subsequent evaluation. The Air Force did not "unreasonably discount[] the importance of price," (iAccess's MJAR at 38), but weighted it in line with the evaluation methodology stated in the Solicitation. Furthermore, the Air Force explained its decision in detail:

> There is a substantial tradeoff that justifies awarding to the higher priced Offeror. The benefits of paying for Borsight's stronger technical approach as it relates to Factor 1, Subfactor 2 and stronger past performance in terms of relevancy over iAccess offsets the approximate 7.05% TEP difference between iAccess and Borsight. The benefits of paying for Borsight's stronger technical approach as it relates to Factor 1, Subfactor 2 and Factor 2, Technical Risk offsets the approximate 0.41% TEP between Stevens and Borsight. Therefore, Borsight's proposed approach offers the best value to the Government. Therefore, the SSAC concluded that Borsight is the apparent superior Offeror to iAccess and Stevens and offers the best value to the Government.

(AR 52640) (citation modified).

"An agency's award decision is least vulnerable to challenge when based upon a best value determination." *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 672 (2023) (citation modified). That is so because best-value determinations require the agency to weigh qualitative factors and exercise judgment in balancing price and non-price considerations. Here, the Air Force compared the offerors across the very factors the Solicitation identified as most important: the extent to which each offeror exceeded Subfactor 2 requirements, the degree of technical risk presented, the relevance and strength of past performance, and the price differential. (*See* AR

---

[6] The relevant chart spans two pages of the Solicitation. (AR 18113–14, ECF No. 32). For clarity and ease of formatting, this chart was reproduced in this Opinion, rather than copied and pasted.

52640). The Source Selection Authority expressly weighed the incremental technical benefits Borsight offered under Subfactor 2, its lower technical risk, and its stronger past-performance relevance against the comparatively modest price advantages of iAccess and Stevens. (*Id.*). This balancing of qualitative strengths against price was precisely the tradeoff the Solicitation contemplated, and iAccess's dissatisfaction with the outcome of the Agency's analysis does not constitute grounds to disturb the contract decision.

### E.  Miscellaneous Motions

In addition to the parties' MJARs, the Court has two pending motions related to the Administrative Record. First, the United States moved to include inadvertently omitted attachments to Tab 142 of the AR related to the Contractor Responsibility Determination & Findings and to correct Tab 147 by withdrawing the document "inadvertently" filed under that tab. (Def.'s Mot. to Correct at 1, ECF No. 41). The Court granted the Motion in part with respect to Tab 142, but deferred ruling on the portion of the motion that concerned withdrawing Tab 147. (Order, ECF No. 57)

The United States argues that Tab 147 is not part of the Air Force's official record. (Def.'s Mot. to Correct at 2). This rationale stems from the fact that "the document was prepared in October 2025, and, thus, was not prepared in connection with the Source Selection Authority's September 22, 2025 'Source Selection Decision Document – Revised' or the Air Force's September 22, 2025, Notice of Award to Borsight[.]" (*Id.*). The United States cites RCFC Appendix C, ¶ 22 for the principle that the administrative must include "relevant core documents," and *Joint Venture of Comint Systems Corporation v. United States*, 100 Fed. Cl. 159, 166 (2011) for the holding that "[i]t is well settled that the primary focus of the court's review of agency decision making should be the materials that were before the agency when it made its final decision." (*See id.* at 2). Tab 147 spans eight pages of the AR and explains how the Agency calculated the aggregate value of past and future contract performance value for all of the offerors. (AR 49172–76). The document also explains the Air Force's methodology for making the aggregate number of aircraft modified determination. (AR 49177–80). Both Plaintiffs and Borsight appear in the spreadsheets contained in the document. (AR 49174–76, 49179–80).

iAccess argues that Tab 147 is "the only substantive explanation of the aggregation methodology used by [the Air Force] as part of the past performance evaluation to determine how the offerors' past performance references were ranked." (iAccess's Resp. at 1, ECF No. 48). iAccess asserts that Tab 147 is indeed a core document, and that "[t]his court has held that the AR must include *all* relevant documents from *all* Agency decision-makers *throughout the scope of the procurement* at issue." (*Id.* at 2). While the Court declines to reach that broadly, it does agree with iAccess that Tab 147 is necessary for effective judicial review. Aggregation of past performance contracts is one of the key issues in this bid protest, (*see* iAccess's MJAR at 22–24; iAccess's Resp. at 3–4), and the document itself was prepared *nearly* contemporaneously with the Source Selection Authority's September 22, 2025, Revised Source Selection Decision Document, (*see* Def.'s Mot. to Correct at 2). Therefore, the United States' Motion is **DENIED**.

Second, Stevens moves to include a "Declaration of Gene Gunnin, Stevens'[s] Vice President of Government Programs" because it is "necessary for judicial review since it constitutes the sole source of certain evidence relating to prejudice." (Stevens's Mot. to Suppl. at

1, ECF No. 50). Stevens argues that the Gunnin Declaration demonstrates how the Agency's unequal discussions prejudiced Stevens, and identifies the specific actions Stevens could have taken. (*Id.* at 3–5). Therefore, Stevens posits that the Declaration is necessary to demonstrate prejudice. (*Id.* at 5). Borsight requests that the Court deny Stevens's Motion because it is unnecessary for effective judicial review and has little probative value. (Borsight's Resp. at 2–5, ECF No. 55). Borsight argues that "the Gunnin Declaration goes far beyond prejudice and instead attempts to characterize documents that are already in the administrative record[,]" and does not sufficiently explain whether the statements contained therein are based on personal knowledge. (*Id.* at 2–4); *see Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–80 (Fed. Cir. 2009). The Court agrees. The Gunnin Declaration does not belong in the Administrative Record. However, because Stevens attached the Declaration as an exhibit to its MJAR, (*see* Stevens's MJAR Ex. 1, ECF No. 51-1), the Motion is **DENIED as MOOT**.

### III.    Conclusion

Stevens's and iAccess's claims fail on multiple grounds. The Air Force acted within the broad discretion afforded to it by law, and this Court will not disturb a decision simply because Plaintiffs would have preferred a different outcome. Nor does the law require an Agency to provide the step-by-step accounting of its decision making that the Plaintiffs demand—such a standard finds no support in law and would impose obligations on agencies far beyond what the APA contemplates. Having reviewed the extensive record, the Court finds no agency action that could be considered arbitrary, capricious, or otherwise not in accordance with law. Plaintiffs have not carried their burden in this bid protest.

Therefore, both Stevens's and iAccess's MJARs are **DENIED**, (ECF Nos. 51, 52), and the United States' and Borsight's Cross-MJARs are **GRANTED**, (ECF Nos. 63, 64). Finally, the United States' Motion to Amend/Correct the Administrative Record, (ECF No. 41), is **DENIED**, and Stevens's Motion to Supplement the Administrative Record, (ECF No. 50), is **DENIED as MOOT**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **fourteen (14) days** of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge